## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

STEPHEN G. LINGIS, DONALD L. SMITH )
and PETER D. WHITE, on behalf of )
Themselves and a Class of Person Similarly )
Situated, )
                                       )
             Plaintiffs-Intervenors, )
                                        )
       v. )     No. 03 C 5044
                                        )
MOTOROLA, INC., DAVID DEVONSHIRE, )     Judge Rebecca R. Pallmeyer
THE PROFIT SHARING COMMITTEE OF )
MOTOROLA, INC., RICK DORAZIL, )
CHRISTOPHER B. GALVIN, ROBERT L. )
GROWNEY, RONNIE C. CHAN, )
H. LAURANCE FULLER, ANNE P. JONES, )
DONALD R. JONES, JUDY C. LEWENT, )
WALTER E. MASSEY, NICHOLAS )
NEGROPONTE, JOHN E. PEPPER, JR., )
SAMUEL C. SCOTT III, GARY I. TOOKER, )
B. KENNETH WEST, JOHN A. WHITE and )
CARL L. KOENEMANN, )
                                        )
             Defendants. )

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendant Motorola, Inc. is a Fortune 100 telecommunications company that sells products

ranging from cell phones and digital video recorders to broadband network infrastructure. During

the technology boom of the 1990s, Motorola's stock price increased ten-fold, as the company

expanded both nationally and globally. In the late 1990s, a Motorola affiliate entered into an

agreement with a Turkish telecommunications company called Telsim to finance Telsim's purchase

of cellular infrastructure in Turkey. After several amendments to the original agreement, Motorola

ultimately lent Telsim nearly $2 billion. In exchange, Telsim pledged 66% of its outstanding shares

as collateral for the loan. In 2001, Telsim defaulted on its loan payments and refused to honor its

share pledge agreement with Motorola. At least in part because of these defaults, the price of

Motorola's shares plummeted. These events sparked numerous lawsuits, including suits between

Motorola and Telsim, a class action securities fraud case filed by investors, and this case, brought under the Employee Retirement Income Security Act ("ERISA").

Plaintiffs in this case are a class of Motorola employees who held Motorola stock in their individual retirement accounts. These accounts, also referred to as "401(k) accounts" based on their privileged status within the tax code, were established pursuant to a plan that gave employees nine different investment options in which to invest their retirement savings. One option was the Motorola Stock Fund, which, as its name would suggest, consisted of Motorola securities. According to Plaintiffs, Motorola and many of its officers and directors breached fiduciary duties they all owed to Plaintiffs under ERISA by continuing to offer the Motorola Stock Fund as an investment option in their 401(k)s when they knew about the problems with the Telsim loan. Plaintiffs further allege that Defendants misrepresented Motorola's financial health to them in violation of their ERISA duties. Both Plaintiffs and Defendants have moved for summary judgment. For the reasons given below, Plaintiffs' motion is denied and Defendants' motions are granted.

## FACTUAL BACKGROUND

*The Parties*

Plaintiffs Stephen Lingis, Donald Smith, and Peter White are former Motorola employees. (Defs.' 56.1 ¶ 94.) During their tenure at Motorola, including during the class period, they invested in the Motorola Stock Fund through the Motorola 401(k) Plan (the "Plan"). (*Id.*) Lingis, Smith, and White represent a class consisting of "all persons for whose individual accounts the Motorola 401(k) Savings Plan purchased and/or held shares of the common stock of Motorola, Inc. at any time from May 16, 2000 to May 14, 2001, inclusive."[1] (Am. Class Order [ 290] ¶ 2.)

Fifteen Defendants have submitted a total of eight separate motions for summary judgment

_____

[1]     The class does not include those who signed valid releases of their claims against Motorola, Inc.. The class also does not include the individual Defendants named in this suit, nor the current officers and directors of Motorola. (Am. Class Order [290].)

now before the court.  Two of the Defendants are entities: Motorola, Inc. and the Profit Sharing Committee of Motorola, Inc. (the "Profit Sharing Committee" or "Committee").  During the class period, the Committee consisted of individuals appointed by the Board of Directors for the purpose of administering the Plan.  (Defs.' 56.1 ¶¶ 31-32).  As of 2006, the Committee no longer existed, and administration of the 401(k) Plan was assumed by the "Retirement Benefits Committee."  (*Id.* ¶ 39.)  Two individuals who were members of the Committee during the class period have been named as Defendants: Carl Koenemann, the Chief Financial Officer ("CFO") of Motorola (*id.* ¶¶ 33-34); and Gary Tooker, who served on the Committee until the end of 2000 and had previously served as Chief Executive Officer ("CEO") of Motorola and the Chairman of the Board of Directors.  (*Id.* ¶¶ 171, 174.)  A third individual Defendant, Rick Dorazil, was the Vice President of Global Rewards-Benefits during the class period, meaning that he was "responsible for strategy, design, implementation, communications, and compliance matters relating to Motorola's benefits programs, including the 401(k) plan."  (*Id.* ¶ 136.)  Dorazil was neither a Director nor a member of the Profit Sharing Committee during the class period.

The remaining individual Defendants were all members of the Motorola Board of Directors during the class period.  The Chairman of the Board, Christopher Galvin, also served as Motorola's CEO during the class period. (*Id.* ¶ 141.)  Another Director, Robert Growney, was Motorola's Chief Operating Officer ("COO").  (*Id.* ¶ 142).  The remaining Director Defendants were independent Directors, at least in the sense that they were not employed by Motorola.[2]

*Telsim*

Details of the relationship between Telsim and Motorola have been described in depth in other decisions, so the court provides only a brief overview here.  *See, e.g.*, *In re Motorola Sec.*

---

[2]    These Defendants are: H. Laurance Fuller; Anne P. Jones; Judy C. Lewent; Dr. Walter E. Massey; Nicholas Negroponte; John E. Pepper, Jr.; Samuel C. Scott III; and Dr. John A. White.  (Defs.' 56.1 ¶¶ 139-177.)

*Litig.*, No. 03 C 287, 2004 WL 2032769 (N.D. Ill. Sept. 9, 2004); *Motorola Credit Corp. v. Uzan*, 274 F. Supp. 2d 481, 491 (S.D.N.Y. 2003), *vacated in part*, 388 F.3d 39 (2d Cir. 2004). On April 24, 1999, the Motorola Credit Corporation ("MCC"), an international supplier of telecommunications equipment and a wholly-owned subsidiary of Motorola, Inc., entered into agreements with Turkey's second largest cell phone company, Telsim Mobil Telekomunikayson Hizmetleri, A.S. ("Telsim"). (Defs.' 56.1 ¶¶ 65-67.) Under these agreements, Telsim purchased cellular infrastructure equipment from Motorola's United Kingdom affiliate, as well as licenses required by the Turkish government to run a cellular service in Turkey. (*Id.* ¶¶ 67-68.) To finance these purchases, MCC loaned Telsim more than $550 million, secured by a pledge of 51% of Telsim's stock to MCC. (*Id.* ¶¶ 67-69.) The agreements were amended several times over the following months, usually to increase the amount of money MCC loaned to Telsim; as of September 29, 2000, when MCC made its final loan to Telsim, MCC had loaned Telsim more than $1.8 billion, secured only by a pledge of 66% of Telsim's then-outstanding shares. (*Id.* ¶¶ 70, 72, 74.) On April 24, 2001, unbeknownst to MCC, Telsim tripled the number of shares it held outstanding, thus diluting the collateral for the MCC loan to 22% of outstanding Telsim shares. (*Id.* ¶ 80.) Six days later, on April 30, Telsim defaulted on its first loan payment, and MCC issued a notice of default three weeks later. (*Id.* ¶ 81.)

The parties dispute how forthcoming Motorola was regarding its relationship with Telsim in its filings with the Securities and Exchange Commission ("SEC") during this period. On May 16, 2000 (the start of the class period), Motorola filed its 10-Q quarterly report with the SEC, in which Motorola stated: "The Company signed an agreement with Telsim, which is estimated to have a sales potential of at least $1.5 billion over three years. Under this agreement, the Company expects to provide infrastructure equipment, wireless phones and associated services to expand the countrywide GSM [Global System for Mobile communications] network in Turkey." (*Id.* ¶ 73.) The 10-Q disclosure makes no mention of Motorola's loans to Telsim.

The May 16 report appears to be the last specific reference to Telsim in any SEC filing until

the 10-Q filed on May 14, 2001 (the close of the class period). The May 14, 2001 report discussed specifics regarding Telsim's indebtedness and default:

> Some purchasers of the Company's infrastructure equipment continue to require suppliers to provide financing in connection with equipment purchases. Financing may include all or a portion of the purchase price and working capital. The Company may also assist customers in obtaining financing from banks and other sources. Although there are no outstanding financing commitments relating to third-generation (3G) wireless networks, the Company may provide such financing in the future. At March 31, 2001 and December 31, 2000 the Company had long-term finance receivables of $2.7 billion and $2.6 billion, respectively (net of allowance for losses of $218 and $233 million, respectively), which are included in other assets on the consolidated balance sheets. At March 31, 2001, the Company had outstanding unfunded commitments to provide financing to third parties of approximately $161 million.

> As of March 31, 2001, approximately $2.0 billion of the $2.9 billion in gross long-term finance receivables related to one customer, Telsim, in Turkey (the "Telsim Loan"). Motorola's collateral for the vendor financing provided to Telsim is the ability, pursuant to a stock pledge agreement, to receive or sell 66% of the stock of Telsim. In addition, Motorola has other creditor remedies. On April 30, 2001, $728 million of the Telsim Loan became due, but was not paid. Under the terms of the Telsim Loan, Telsim has 30 business days to cure its failure to make this payment before an event of default occurs. Motorola is currently in discussions with Telsim to reschedule payments, including the April 30th payment, under the Telsim Loan.

(*Id.* ¶ 82.) A similar statement had appeared in a March 2001 proxy statement, although that statement obviously did not contain the warning about the April 2001 default. (*Id.* ¶ 78.)

The only other disclosures made by Motorola during the class period that even arguably related to the Telsim transaction were generic references to Motorola's practice of vendor financing. In November 2000, for instance, Motorola's 10-Q read: "The company wishes to caution the reader that the factors below . . . could cause the Company's results to differ materially from those stated in the forward-looking statements. These factors include: . . . (vi) the demand for vendor financing and the Company's ability to provide that financing in order to remain competitive . . . ." (*Id.* ¶ 75.) Motorola also informed investors that it "may also assist customers in obtaining financing from banks and other sources." (*Id.* ¶ 76.)

Defendant Koenemann, Motorola's CFO, was involved in working on financing deals with

Telsim as early as 1998. (Pls.' 56.1 ¶ 73.) Although the record does not clearly reflect when Koenemann first became aware of potential problems—or of the severity of those problems—with the transaction, it is clear that he discussed potential problems with the Telsim loan with KPMG, Motorola's external auditor, around the time of the signing of the final amendment in September 2000. (Defs.' Resp. to Pls.' 56.1 ¶ 45.) Koenemann discussed these issues with Galvin and Growney around the same time, although they certainly knew about the loan itself before then. (Pls.' 56.1 ¶¶ 52, 77-78.) The record contains no evidence that any of the other Defendants—including Dorazil, Tooker, and the outside directors—had any knowledge of any problems with the Telsim transaction. (*E.g.* Pls.' Resp. to Defs.' 56.1 ¶¶ 137, 173, 174, 153, 154, 166, 167.)

At least in part because of the Telsim transactions, Motorola's financial position deteriorated during the class period. Motorola reported net income of $2.2 billion for the fiscal year ending December 31, 2000; the following year, Motorola reported a net loss of $5.5 billion. (Pls.' 56.1 ¶¶ 58-59.) This change in fortune was also reflected in Motorola's share price: based on publicly available information, the share price of Motorola dropped from around $30 per share at the start of the class period to about $15 per share at the end. *See* Yahoo! Finance, http://finance.yahoo. com/q?s=mot (last visited June 16, 2009).

*The 401(k) Plan*

Throughout the class period, the Profit Sharing Committee administered the 401(k) Plan and was the named fiduciary of the Plan. (Pls.' 56.1 ¶ 120.) Defendant Tooker chaired the Committee through the end of 2000 and was succeeded by Koenemann. (*Id.*) The Motorola Board of Directors appointed the members of the Committee; at least during the class period, the Committee members were appointed to one-year terms. (*Id.* ¶ 124; Defs.' 56.1 ¶¶ 33-34.) The 401(k) Plan provided individual retirement accounts to employees of Motorola. Participants in the Plan directed the investments of their own accounts. (Defs.' 56.1 ¶ 9.) Prior to July 1, 2000, employees had four

6

investment options from which to choose: the Balanced Fund, the Equity Fund, the Short-Term Income Fund, and the Motorola Stock Fund. (*Id.* ¶ 11.) After that date, participants had nine options: the Short-Term Bond Fund, the Long-Term Bond Fund, Balanced Fund I, Balanced Fund II, the Large Company Equity Fund, the Mid-Sized Company Equity Fund, the International Equity Fund, the Small Company Fund, and the Motorola Stock Fund. (*Id.* ¶ 12.) Plan participants were provided with materials to help them make investment decisions, including Summary Plan Descriptions, newsletters, and a Prospectus that discussed each of the nine investment options. (*Id.* ¶ 44.) The Prospectus and Summary Plan Description ranked the riskiness of the various investments, and warned that the Motorola Stock Fund was the riskiest of the nine funds offered. (*Id.* ¶ 45.) The governing documents of the Plan did not require that the Motorola Stock Fund be offered at all, but did explicitly permit the Plan to offer the Fund as an option. (Pls.' 56.1 ¶¶ 134-35.) At no time were participants required to invest in the Motorola Stock Fund. (Defs.' 56.1 ¶ 15.)

Participants could contribute up to 20% of their compensation to their 401(k) account. Motorola made additional contributions as well: the company matched the first 3% of the employee's income contributed to the employee's account dollar-for-dollar, and matched the next 3% of income at fifty cents to the dollar. (*Id.* ¶ 19.) Each participant could choose the manner in which the matching funds were provided, including designating one of the nine investment options to receive the matching contribution, or receiving the contribution directly in Motorola stock. (*Id.*) For any participant who did not specify a method, the matching contribution was made, by default, to the Balanced Fund (which contained no Motorola stock). (*Id.*)

Several significant changes were made to the Plan on July 1, 2000, a date that falls within the class period. Prior to that date, employees were restricted to investing no more than 25% of their account in the Motorola Stock Fund. (*Id.* ¶ 20.) In June 1999, however, as Motorola stock was

experiencing strong growth, over 80% of Motorola employees voted to remove the cap.[3] (*Id.*)

Consequently, Motorola employees could invest their entire 401(k) plans in the Motorola Stock Fund after July 1. (*Id.* ¶ 20.) Another change that went into effect on July 1, 2000 allowed participants to reallocate their assets among the nine available funds on a daily basis. (*Id.* ¶ 16.) Prior to that time, participants were permitted to reallocate their assets only once a month, though they were permitted to transfer funds out of the Motorola Stock Fund daily.[4] (*Id.*)

*Litigation History*

On July 21, 2003, Bruce Howell initiated this action on behalf of himself and a class of Motorola employees who invested in the Motorola Stock Fund through their 401(k) plans. Howell's complaint asserted a claim under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, which, among other things, imposes fiduciary duties upon those who administer or otherwise control employee retirement accounts. On September 23, 2004, this court granted in part Defendants' motion to dismiss, finding that Plaintiffs had failed to allege a breach of fiduciary duty by the individual members of the Profit Sharing Committee, where the members were not even alleged to have knowledge of the Telsim transaction. *Howell v. Motorola, Inc.*, 337 F. Supp. 2d 1079, 1091-92 (N.D. Ill. 2004). The litigation has since been delayed significantly by the inability to secure a class representative. In September 2005, the court denied Howell's motion for class certification, finding that he was an inadequate representative because he had signed a written waiver and release of claims upon his termination from Motorola. *Howell v. Motorola, Inc.*,

---

[3] Defendants imply that lifting the cap was the direct result of the employees' vote, although the documents governing the plan do not appear to require such a vote to enact the change. (Pls.' Resp. to Defs.' 56.1 ¶ 20; Dorazil Dep. at 79-80, Ex. 18 to Defs.' 56.1; Ex. 2 to Defs.' 56.1.) It is unclear whether Defendants could have disregarded the employees' vote and maintained the cap.

[4] For the two months leading up to July 1, 2000, when several significant changes were made to the Plan and a new record-keeper was installed, participants were prohibited from contributing to, withdrawing from, or transferring money between investment options in their personal accounts. (Defs.' 56.1 ¶ 13.)

No. 03 C 5044, 2005 WL 2420410 (N.D. Ill. Sept. 30, 2005). The court later declined to approve the appointment of another class representative, John Endsley, concluding that he lacked standing because he had received a full distribution under the Plan. *Howell v. Motorola, Inc.*, No. 03 C 5044, 2006 WL 2355586 (N.D. Ill. Aug. 11, 2006).

Finally, on November 1, 2007, the court certified a class consisting of "all persons for whose individual accounts the Motorola 401(k) Savings Plan purchased and/or held shares of the common stock of Motorola, Inc. at any time from May 16, 2000 to May 14, 2001, inclusive, except persons who signed valid releases of their claims against Motorola, Inc. [and current and former directors and officers of Motorola]."[5] (Am. Class Order [290] ¶ 2.) Plaintiffs Lingis, Smith, and White were named class representatives, after they had intervened in the action. (*Id.* ¶ 4.) The Complaint in Intervention (hereinafter "Complaint") alleges that Defendants breached their fiduciary duties to Plaintiffs by continuing to offer, and continuing to hold, the Motorola Stock Fund as an investment option under the Plan despite looming problems with the Telsim transaction. Count I charges that Defendants breached their fiduciary duties to act with prudence by offering what was, given the realities of the Telsim transaction, an imprudent investment. In Count II, Plaintiffs allege that Defendants negligently misrepresented and failed to disclose material information relating to the Telsim transaction, particularly in the SEC filings filed by Motorola during this period. Count III is brought only against the Director Defendants—including Galvin and Growney—and Motorola, and alleges that the directors failed to appoint appropriate fiduciaries to the Profit Sharing Committee, failed to monitor the Committee members adequately, and withheld material information from the Committee. Each of the three Counts contains a paragraph asserting that each Defendant is also

_____

[5]     Several of the court's decisions have been appealed. Appeals from Plaintiff Howell's dismissal from the case as well as the court's grant of class certification are currently pending before the Seventh Circuit. Howell also appealed the court's decision dismissing Endsley from the suit, but the Seventh Circuit dismissed that appeal for want of jurisdiction. (12/12/06 Mandate [185].)

liable as a co-fiduciary pursuant to ERISA § 405(a), which makes a fiduciary liable for the acts of another fiduciary in certain circumstances. 29 U.S.C. § 1105(a). Plaintiffs have not supported that allegation with any argument in any of their briefs for the motions now under consideration, however, and the court considers the argument waived. *Argyropoulos v. City of Alton*, 539 F.3d 724, 739 (7th Cir. 2008).

On February 15, 2008, both Defendants and Plaintiffs moved for summary judgment on all claims. The court now considers the competing motions of Defendants and Plaintiffs.

## ANALYSIS

Summary judgment should be granted in favor of a party "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The parties here have submitted cross-motions for summary judgment, and the court will "construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made." *First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009) (citing *In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006)). Plaintiffs argue that they are entitled to summary judgment on all counts because offering the Motorola Stock Fund as an investment option violated Defendants' duties of prudence; Defendants misrepresented the company's financial situation to the Plan participants; and the director Defendants failed to appoint and monitor appropriate fiduciaries to the Committee. Defendants also maintain that they are entitled to summary judgment. First, Defendants argue that a safe harbor provided in ERISA for plans in which participants exercise control over their own investments relieves Defendants of any liability they may otherwise have under ERISA. Second, Defendants argue that, regardless of the applicability of the safe harbor, they did not violate any fiduciary duties owed to Plaintiffs. The court agrees with Defendants both that the safe harbor applies and that Plaintiffs have not established

that a genuine dispute exists regarding any of their claims. Accordingly, Defendants are entitled to summary judgment on all claims.

## I.    Section 404(c) Safe Harbor

Defendants maintain that they are entitled to summary judgment on all of Plaintiffs' claims based solely upon section 404(c) of ERISA. 29 U.S.C. § 1104(c). In pertinent part, section 404(c) states:

> In the case of a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over the assets in his account . . . no person who is otherwise a fiduciary shall be liable under this part for any loss, or by any reason of any breach, which results from such participant's or beneficiary's exercise of control . . . .

*Id.* § 1104(c)(1)(A)(ii). Section 404(c) thus transfers a substantial part of the responsibility for conscientiously maintaining a retiree's investments from the plan fiduciary to the retiree herself. A Department of Labor regulation, 29 C.F.R. § 2550.404c-1 (the "implementing regulation"), lists a number of criteria that must be met for a defendant to take refuge in the section 404(c) safe harbor. Plaintiffs' Complaint anticipated reliance on this defense and identified four specific provisions of the regulation with which Defendants allegedly failed to comply. (Compl. ¶ 55.) The first two provisions fall into the general category of failure to provide sufficient information: specifically, the Plan's purported failure to disclose that it had shifted liability for investment decisions to Plaintiffs, and the failure to provide an adequate description of the investment alternatives. 29 C.F.R. § 2550.404c-1(b)(2)(i)(B). The second two provisions identified by the Complaint allege that Plaintiffs did not actually exercise independent control over the investments: first, because Defendants subjected Plaintiffs to undue influence; and second, because Defendants did not disclose all material information to Plaintiffs. *Id.* § 2550.404c-1(c)(2).

### A.    Sufficient Information

For the safe harbor to apply, participants in the 401(k) plan "must be given or have the opportunity to obtain 'sufficient information to make informed decisions with regard to investment

11

alternatives available under the plan.'" *Hecker v. Deere & Co.*, 556 F.3d 575, 587 (7th Cir. 2009) (quoting 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)). The Plan must meet nine separate criteria in order to satisfy this test, *Hecker*, 556 F.3d at 587, but Plaintiffs challenge only two of them. First, Plaintiffs alleged that Defendants did not disclose in advance that liability would be shifted to Plaintiffs under the 404(c) plan. (Compl. ¶ 55(a).) Plaintiffs did not advance this argument at the summary judgment stage, however, and for good reason—the August 2000 Prospectus sent to Plan participants explained:

> The 401(k) Profit Sharing Plan is intended to constitute a plan described in Section 404(c) of ERISA and Section 2550.404c-1 of Title 29 of the Code of Federal Regulations. This means that the fiduciaries of the Plan may be relieved of liability for any losses that are the direct and necessary result of investment decisions made, and investment decisions given, by you as a Plan participant or beneficiary with respect to the investment of the money in your accounts in the various funds of the Plan.

(Ex. 6 to Defs.' 56.1 at 3.) This language satisfies ERISA's requirement that a Plan participant be advised "that the fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participant." 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(i).

Plaintiffs next contend that the Plan did not adequately describe the investment objectives and the "risk and return" characteristics of the investment options offered by the Plan. Under the regulation, the Plan is required to describe "the investment alternatives available under the plan and, with respect to each designated investment alternative, a general description of the investment objectives and risk and return characteristics of each such alternative, including information relating to the type and diversification of assets comprising the portfolio of the designed [sic] investment alternative." *Id.* § 2550.404c-1(b)(2)(i)(B)(1)(ii). The court concludes that Defendants have met this requirement as well, as Plan participants were provided with ample information regarding investment alternatives. The general benefits pamphlet distributed to Motorola employees includes a chart that lists the nine funds, provides short phrases describing the objectives and investment

12

strategies of each one, and ranks them from lowest to greatest risk. (Ex. 5 to Defs.' 56.1 at 82.) Plaintiffs suggest that the chart itself is misleading, as the risks of a non-diversified fund are qualitatively different from the risks of the other eight diversified funds. Even if this were true—and the court is not persuaded that non-diversified funds are simply incomparable to diversified funds—the participants were provided additional information relating directly to the non-diversification risks associated with the Motorola Stock Fund. In a separately distributed prospectus, Motorola informed Plan participants that the Motorola Stock Fund "may be adversely affected by nondiversification risk, which is the risk that the shares of this fund are likely to fluctuate in value more than those of a fund investing in a broader range of securities." (Ex. 6 to Defs.' 56.1 at 21.) Simply ranking the investment funds in terms of relative levels of risk was not in itself misleading, and the court is satisfied that the chart and the statement regarding non-diversification risk provided participants with ample information to make an informed decision.

The prospectus contains additional information regarding the individual investments offered by the Plan. In addition to reprinting the chart described above, the prospectus also provides details concerning each of the nine funds, devoting short paragraphs to describing each fund's investment objectives, investment strategies, primary investment risks, investment managers, and past performance. (*Id.* at 5-6.) For each fund, including the Motorola Stock Fund, the prospectus includes a chart tracking the annual return over the prior decade, and also discloses the best and worst single quarters of each fund. (*Id.*) This is more than adequate information to permit an investor to make informed decisions concerning her assets in an ERISA-covered Plan, as contemplated by section 404(c). *Cf. DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 420-21 (4th Cir. 2007) (expressing general approval of a 401(k) plan that "explicitly informed participants, in words as well as through use of a clear graphic, that the Company Fund carried the highest risk of the available options").

**B.      Independent Control**

Plaintiffs also contend that Defendants deprived them of the opportunity to exercise independent control over their assets, as required by both the statute and the regulation. "Whether a participant or beneficiary has exercised independent control in fact with respect to a transaction depends on the facts and circumstances of the particular case." 29 C.F.R. § 2550.404c-1(c)(2). The regulation explains that a participant's control will be deemed not independent in the following circumstances: (1) where the plan fiduciary subjected the participant to improper influence over a transaction; (2) where the "plan fiduciary has concealed material non-public facts regarding the investment from the participant"; or (3) where the participant is legally incompetent. 29 C.F.R. § 2550.404c-1(c)(2)(i)-(iii). The first and third scenarios are not relevant here.[6] Plaintiffs contend, however, that Defendants concealed material information about the Telsim transaction, thereby preventing them from being able to exercise independent control over their funds in the Plan. There is no dispute that the relevant facts surrounding the Telsim transaction were non-public. Thus, to establish that Plaintiffs exercised independent control under 29 C.F.R. § 2550.404c-1(c)(2)(ii), Defendants have to show that there are no disputes of material fact concerning whether Defendants concealed material facts.

As described in greater detail below, the court concludes that Defendants are entitled to summary judgment because no genuine issue of material fact exists that any of the Defendants concealed material non-public facts about the Motorola Stock Fund. In reaching this conclusion, the court notes that Plaintiffs appear to have exaggerated the strictures of section 404(c): they argue that to avail themselves of the section 404(c) defense, "Defendants would have to show that all material information necessary to make informed investment judgments [was disclosed] to the participants." (Pls.' Mem. in Opp'n at 21.) As the court reads the statute and regulation, however,

_____

[6]    As mentioned above, Plaintiffs claimed in the Complaint that the undue influence exception did apply. (Compl. ¶ 55(b).) They did not advance this argument in their summary judgment briefs, however, and the court finds nothing in the record to support a claim of undue influence.

neither provision requires a fiduciary to guarantee that all material facts are conveyed to participants. Rather, the regulation prohibits fiduciaries from *concealing* such facts. 29 C.F.R. § 2550.404c-1(c)(2)(ii). The distinction is an important one, as concealment requires a party to take some affirmative steps to "hide, secrete, or withhold [information] from the knowledge of others." BLACK'S LAW DICTIONARY 288 (6th ed. 1990); *cf. In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 242 F.3d 497, 503 (3d Cir. 2001) (requiring proof of "affirmative steps" to show "concealment"). The implication of this distinction bears differently on different groups of Defendants, some of whom had access to information that others lacked.

### 1. Independent Directors, Dorazil, and Tooker

As a matter of logical necessity, one must have knowledge of a fact before one can take steps to conceal it. Plaintiffs argue that Defendants' duty to monitor the investment options created a standard that renders Defendants liable for failures to disclose information that they either knew or should have known. (Pls.' Mem. in Opp'n at 16-19.) Whether this appropriately states the standard for a breach of fiduciary duty is irrelevant here, as the court is only concerned with what can show concealment. A "should have known" standard is difficult to enforce in the context of concealment—one cannot hide or withhold information that one does not know.[7] Accordingly, the court considers what each Defendant actually knew about the Telsim deal.

Several Defendants were not aware of the problems in the Telsim deal during the alleged class period. Plaintiffs do not dispute that Rick Dorazil possessed no knowledge of any problems

---

[7] The court recognizes that in some circumstances, concealing information that one should have known or suspected might support a finding of willful blindness. *See In re Aimster Copyright Litigation*, 334 F.3d 643, 650 (7th Cir. 2003) ("One who, knowing or strongly suspecting that he is involved in shady dealings, takes steps to make sure that he does not acquire full or exact knowledge of the nature and extent of those dealings" is willfully blind.); Model Penal Code § 2.02(7). The facts do not support such a finding in this case, however. There may be a genuine dispute about whether Defendants should have known about the Telsim transaction, but nothing in the record supports a conclusion that any of the Defendants deliberately avoided learning about it.

between Motorola and Telsim during the class period. (Pls.' Resp. to Defs.' 56.1 ¶ 137.) The parties also agree that Gary Tooker was unaware that Telsim owed Motorola substantial sums of money and was in default. (*Id.* ¶¶ 173-75.) Finally, Plaintiffs have failed to demonstrate the existence of a genuine issue that any of the outside directors had any knowledge of problems with the Telsim transaction. Several of the outside directors testified in depositions that they did not recall learning any non-public information regarding the Telsim deal within the class period. (*E.g.* Jones Dep. at 157-160, Ex. 26 to Defs.' 56.1; Negroponte Dep. at 7-9, Ex. 51 to Defs.' 56.1.) Plaintiffs have not offered any evidence to the contrary. Through extensive depositions and fact discovery, Plaintiffs failed to raise a genuine issue of material fact that the outside directors knew anything more than what appeared in the 10-Q, which was necessarily public information. Therefore, summary judgment is appropriate for Dorazil, Tooker, and the Director Defendants (other than Galvin and Growney) on the ground that they did not possess enough knowledge of the Telsim transaction to support a finding that they concealed non-public information about it.

### 2. Galvin, Growney, Koenemann, and the Committee

The remaining individual Defendants—Koenemann, Galvin, and Growney—all knew non-public facts concerning the riskiness of the Telsim deal. Plaintiffs maintain that these Defendants' failure to inform the beneficiaries of these risks constituted the concealment of material non-public information. Defendants argue in response that ERISA imposes no duty on them to disclose the information at issue in this case, and the court agrees.

Defendants are entitled to rely on the "safe harbor" defense unless they concealed material non-public information, but the regulation itself does not explain what kind of information falls into that category. Absent any other authority that is directly on point, the court concludes that, consistent with the *in pari materia* canon of interpretation that two statutes with the same purpose should be construed as consistent with one another, the disclosure duty contemplated by the regulation is equivalent to the disclosure duty imposed by ERISA more generally. *E.g. Sullivan v.*

*Finkelstein*, 496 U.S. 617, 632 (1990) ("statutes *in pari materia* should be interpreted harmoniously"). Admittedly, this interpretation makes it difficult to imagine a situation in which a Defendant may have violated ERISA's duty of disclosure but still find refuge in the 404(c) safe harbor. *Cf. Hecker*, 556 F.3d at 585-90 (applying section 404(c) after concluding that fiduciaries did not violated any disclosure duties imposed by ERISA). The court nevertheless concludes that this is the most appropriate reading of the regulation, and that this overlap is preferable to creating a separate set of disclosure duties that ERISA fiduciaries would have to consider in the 404(c) context in addition to the disclosure duties already established by the case law interpreting ERISA's fiduciary obligations. *Cf. Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996) (holding that ERISA's duty of loyalty creates a duty to disclose certain information to beneficiaries). Notably, this interpretation of section 404(c) is actually more generous to plaintiffs, as it limits the applicability of the safe harbor defense to situations in which the plaintiffs do not have a cognizable misrepresentation claim anyway.

Whether Defendants concealed material information and are ineligible for the section 404(c) safe harbor defense therefore merges with Plaintiffs' substantive claims in Count II. Plaintiffs allege in that Count that Defendants negligently misrepresented information about the Telsim loan in Motorola's SEC filings made in 2000 and 2001 and that Defendants failed to disclose material information about that loan. The duty of loyalty that ERISA fiduciaries owe to beneficiaries includes the duty not to deceive the beneficiaries. *See Varity Corp.*, 516 U.S. at 506 ("[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." (citation omitted)). Plaintiffs claim that Defendants violated this duty both by negligently misrepresenting information about Motorola stock to Plaintiffs and by failing to disclose material information about the stock. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 659 (S.D. Tex. 2003) (defendants violated fiduciary duties where they "failed to provide material information *or* correct misleading information essential to prudent administration of the plans" (emphasis

added)).  The court considers each argument in turn.

Plaintiffs' theory that Defendants negligently misrepresented the status of the Telsim loan in Motorola's SEC filings encounters two problems.  First, the Seventh Circuit does not recognize merely negligent misrepresentation as a violation of ERISA.  "[W]hile there is a duty to provide accurate information under ERISA, negligence in fulfilling that duty is not actionable."  *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 642 (7th Cir. 2004).  Plaintiffs' citations to cases in other circuits are unhelpful, as the Seventh Circuit's interpretation of the duty of loyalty is "narrower . . . than [the interpretations] in other circuits."  *Id.*  Plaintiffs have not set out any evidence to suggest that Motorola "set out to disadvantage or deceive its employees," and so a misrepresentation claim is misplaced.  *Id.*

Plaintiffs' negligent misrepresentation theory fails for a second reason as well: the allegedly negligent statements made in the SEC filings were not made in Defendants' capacity as ERISA fiduciaries.

> In every case charging breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.

*Pegram v. Herdrich*, 530 U.S. 211, 226 (2000); *see also King v. Nat'l Human Res. Comm., Inc.*, 218 F.3d 719, 723 (7th Cir. 2000) ("It is clear that a person can be a fiduciary for some purposes but not others." (citing *Lockheed Corp. v. Spink*, 517 U.S. 882 (1996))).  Plaintiffs' negligent misrepresentation claim here rests not on communications directly from Plan fiduciaries but in public filings.  When Defendants signed the 10-K and 10-Q Forms at issue, they did so in their corporate capacities rather than in their fiduciary capacities.  "Those who prepare and sign SEC filings do not become ERISA fiduciaries through those acts, and consequently, do not violate ERISA if the filings contain misrepresentations."  *In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 766 (S.D.N.Y. 2003).

Plaintiffs fail to cite anything misleading about Defendants' acts *as ERISA fiduciaries*. The Complaint alleges that the SPDs, which were distributed to Plan participants, incorporated the SEC filings by reference, but a review of these documents reveals no direct references to the SEC filings in question. Furthermore, when Defendants incorporated the 10-Ks and 10-Qs into the Form S-8 that Motorola was required to file with the SEC on behalf of the Plan, Motorola "was discharging its corporate duties under the securities laws, and was not acing as an ERISA fiduciary." *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 257 (5th Cir. 2008). Aside from the references to the SPDs in the Complaint, Plaintiffs make a number of unsupported assertions in their various briefs that Motorola disseminated other documents to Plan participants that incorporated these or other SEC filings. Plaintiffs have not, however, identified any misrepresentations Defendants made to Plan participants in those other documents, and the court need not consider any other unsupported allegations. *See, e.g., Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 854 (7th Cir.1998) ("This court has refused to consider unsupported or cursory arguments."). In short, any misrepresentation Defendants may have made were made in their capacities as corporate officials, and are remediable under the securities laws rather than ERISA.[8]

Plaintiffs cite *Nelson v. Hodowal*, 512 F.3d 347 (7th Cir. 2008) for the proposition that "communications to 401(k) participants are often effected through SEC filings." (Pls.' Reply at 22.) While this might be true as a general matter, it does not alter the court's conclusion in this case. In *Nelson*, the plaintiffs argued that the corporate defendants had a fiduciary duty to inform the plan participants that the defendants were selling their own personal company stock. *Nelson*, 512 F.3d at 349-50. The court concluded that defendants did not have to inform the plan participants of their

---

[8]      In the securities class action that arose in response to the Motorola-Telsim transactions, the Plan sought to recover from the settlement fund created by the agreement between plaintiff-investors and the Motorola defendants. *In re Motorola Sec. Litig.*, No. 03 C 287. The court denied the Plan's motion for a distribution from the fund on the grounds that the Plan was excluded from the settlement both by the class definition and by the settlement stipulation. (Docket No. 550.) That decision is currently under appeal.

trades, in part because they had filed the appropriate forms required by the SEC covering sales of stock by corporate officials. *Id.* at 350. *Nelson* arguably bolsters this court's conclusion that ERISA fiduciaries' disclosure obligations are not limitless and that disclosures required by SEC regulations are not necessarily also required under ERISA. In any event, *Nelson* does not require the outcome sought by Plaintiffs, as *Nelson* did not address the scope of the duty to disclose information that does not otherwise appear in the public record.

Plaintiffs also argue that Defendants violated their fiduciary duties by failing to disclose material information about Motorola stock. While the duty of loyalty ERISA fiduciaries owe beneficiaries clearly encompasses a duty not to lie, the degree to which that duty imposes an affirmative obligation to disclose material information is unclear. *Varity Corp.*, 516 U.S. at 506 (declining to "reach the question whether ERISA fiduciaries have any fiduciary duty to disclose truthful information on their own initiative"). "The Seventh Circuit has not allowed claims for fiduciary breach based on passive behavior, 'unless a fiduciary fails to give a beneficiary material information regarding a plan and the fiduciary's silence is misleading.'" *Cokenour v. Household Int'l, Inc.*, No. 02 C 7921, 2004 WL 725973, at *7 (N.D. Ill. Mar. 31, 2004) (quoting *Chojnacki v. Georgia-Pacific Corp.*, 108 F.3d 810, 817 (7th Cir. 1997)). The court is unaware of any case in which the Seventh Circuit has held that this duty extends to disclosing information concerning the specific investments offered by the plan. As discussed above, ERISA does not create an obligation to disclose information about an investment option that the public itself does not know when the fiduciaries have made no false or misleading statement to the beneficiaries. *See In re Dynergy, Inc. ERISA Litig.*, 309 F. Supp. 2d 861, 889-90 (S.D. Tex. 2004) (concluding that fiduciaries have a duty to correct their own misstatements made to beneficiaries, but do not have such a duty "regarding misstatements made to the market about the company's financial condition"). Therefore, while Defendants may have had some obligation to disclose Plan-specific information to beneficiaries, they were under no duty to generally share additional information about any of the

various investments—including the Motorola Stock Fund—offered by the Plan. Creating a standard that requires Plan fiduciaries "to continuously gather and disclose nonpublic information bearing some relation to the plan sponsor's financial condition" would "extend[] the statutory language [of ERISA] beyond [its] plain meaning." *Cokenour*, 2004 WL 725973, at *8. This rationale applies with special force to Galvin and Growney who, as noted above, had limited fiduciary obligations as members of the Board who were not directly responsible for the operations of the Plan.

Indeed, courts have suggested that requiring disclosure of non-public information to plan beneficiaries when the information has not been provided to the market generally may run afoul of the insider trading laws. *See Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1098 n.4 (9th Cir. 2004)[9]. The statutory text of ERISA itself counsels against a construction that would require fiduciaries to make otherwise impermissible disclosures. 29 U.S.C. § 1144(d) ("Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States . . . or any rule or regulation issued under any such law.") At the very least, the potential for this conflict suggests that the harm Plaintiffs contend was caused by the lack of disclosure was in fact the result of misleading the marketplace generally rather than misleading ERISA beneficiaries specifically, and that Plaintiffs' proper avenue of relief is pursuant to the securities laws.

In sum, Defendants had no fiduciary duty to disclose information concerning the Telsim deal to Plan participants because they had not, as fiduciaries, provided the participants with any materially misleading information that they had to correct. In fact, the documents that Defendants did provide to Plan participants mentioned that the Motorola Stock Fund was the riskiest investment

---

[9]     In a case similar to this one, in which participants in a retirement plan sued the plan fiduciaries for offering company stock as an investment option despite knowing that the stock was overvalued, the Seventh Circuit noted the insider trading question, but declined to answer it. *Rogers v. Baxter Int'l, Inc.*, 521 F.3d 702, 706 (7th Cir. 2008) (stating that the "question remains unanswered").

option, particularly because it was undiversified. Plaintiffs thus had as much "independent control" over how much of their 401(k) plan to invest in Motorola securities as investors generally possessed in determining how much of their portfolios to devote to Motorola stock. The court concludes that the requirements set forth in the implementing regulation for the section 404(c) safe harbor have been satisfied and that Defendants are entitled to summary judgment on that basis.

## II.    Imprudent Investment

Plaintiffs concede that section 404(c) at least potentially applies to the non-disclosure claims (Count II), but argue that it does not apply to Count I, which alleges that offering the Motorola Stock Fund was itself imprudent. By its terms, section 404(c) only applies when the loss "results from . . . [the] beneficiary's exercise of control." 29 U.S.C. § 1104(c). In other words, the beneficiaries' loss must be caused by the beneficiaries' own decisions rather than another factor. Plaintiffs cite a number of non-binding sources in support of their argument that the decision to offer an investment is necessarily a cause that is not superseded by the beneficiaries' exercise of control over the investment. Most notably, Plaintiffs cite a footnote in the preamble of the implementing regulations, which states that "the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA 404(c) plan is a fiduciary function which . . . is not a direct or necessary result of any participant direction of such plan." Final Regulation Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans), 57 Fed. Reg. 46906, 46924 n.27 (Oct. 13, 1992); *see also DiFelice*, 497 F.3d at 418 n.3 (section 404(c) "does not apply to a fiduciary's decisions to select and maintain certain investment options within a participant-driven 401(k) plan"); *In re Unisys Savings Plan Litig.*, 74 F.3d at 442 (3d Cir. 1996); U.S. Department of Labor, Pension and Welfare Benefits Administration Information Letter, 1997 WL 1824017, at *2 (Nov. 26, 1997). Thus, Plaintiffs insist, Defendants' decision to permit investment in Motorola stock cannot be protected by Section 404(c).

The Seventh Circuit recently addressed this argument directly. In *Hecker v. Deere & Co.*,

a group of plan participants sued their employer, the trustee of the retirement plan, and the plan's investment advisor, alleging that they violated ERISA by charging excessive fees and failing to disclose the fee structure to the participants. 556 F.3d at 578. The court concluded that the comment in the Federal Register was unconvincing, as "this type of informal commentary, which was never embodied in the final regulations, cannot override the language of the statute and regulations." *Id.* at 589. Although the court declined to consider whether section 404(c) "always shield[s] a fiduciary from an imprudent selection of funds under every circumstance that can be imagined, it does protect a fiduciary that satisfies the criteria of [section 404(c)] and includes a sufficient range of options so that the participants have control over the risk of loss." *Id.*; *see also Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 310-11 (5th Cir. 2007) (applying section 404(c) to imprudent investment claim).

In a supplemental brief, Plaintiffs emphasize that the *Hecker* decision, by its own terms, does not cover all imprudent investment claims. *See Hecker*, 556 F.3d at 589 ("Plaintiffs would like us to decide whether the safe harbor applies to the selection of investment options for a plan, but in the end we conclude that this abstract question need not be resolved to decide this case."). Significantly, however, *Hecker* itself dealt with a claim of imprudent selection of investment options, and the court concluded that the safe harbor applies to such a claim when the requirements of the statute and regulation are met. *Id. Hecker* is controlling authority here; the two new district court cases cited by Plaintiff are not binding on this court. *See In re Tyco Int'l Ltd. Multidistrict Litig.*, 606 F. Supp. 2d 166 (D.N.H. 2009); *Page v. Impac Mortgage Holdings, Inc.*, No. SACV 07-1447 AG (MGLx), 2009 WL 890722 (C.D. Cal. Mar. 31, 2009). In any event, the district courts in those two cases both relied heavily upon the comment made in the Federal Register, which the Seventh Circuit has characterized as "informal commentary" that does not "override the language of the statute and regulations." *Hecker*, 556 F.3d at 589.

The inquiry thus turns on whether the plan offers "a broad range of investment alternatives."

23

*Hecker*, 556 F.3d at 589 (citing 29 C.F.R. § 2550.404c-1(b)(3)). Under the regulation, the investment alternatives are adequately broad "only if the available investment alternatives are sufficient to provide the participant or beneficiary with a reasonable opportunity" to "materially affect" potential return and risk exposure; to "choose from at least three investment alternatives that are" diversified and have "materially different risk and return characteristics"; and to diversify in such a way as to minimize the potential for large losses. 29 C.F.R. § 2550.404c-1(b)(3)(A)-(C).

The court is satisfied that these three criteria are met. The Plan offered participants eight diversified funds in addition to the Motorola Stock Fund (which clearly was not diversified). The potential risk and reward balance from the most conservative investment (a short-term bond fund) to the riskiest investment short of the Motorola Stock Fund (a small company fund) runs a wide gamut that afforded Plan participants meaningful choices to affect their risk exposure and their potential for return. Similarly, Plan participants were also able to diversify their portfolio as much as they wished and thereby minimize the risk for large losses, particularly after July 1, 2000, when participants were permitted to reallocate their assets among the nine different funds on a daily basis. The investment alternatives under the Plan were sufficiently broad to enable the participants to make meaningful decisions about their risk exposure and their retirement savings investments. The court concludes that Section 404(c)'s safe harbor applies to Count I of the Complaint as well.

Significantly, even if *Hecker*'s rule did not apply to this case, the imprudent investment claim would fail on its merits. Plaintiffs have not demonstrated a genuine dispute that continuing to offer the Motorola Stock Fund was imprudent. Before explaining this conclusion, the court pauses to address Defendants' contention that they are entitled to a presumption that offering the Motorola Stock Fund was prudent. *See Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995). Defendants point out that the Plan at issue here is an Eligible Individual Account Plan (EIAP), which ERISA exempts from the requirement that plan fiduciaries must diversify the investments if the investments are in employer securities. 29 U.S.C. § 1104(a)(2). Although they are thus exempt from the

diversification requirement, EIAP fiduciaries remain bound by a general duty of prudence. If the plan itself calls for the holding of company stock, the fiduciary may be placed in an "awkward position." *Summers v. State Street Bank & Trust Co.*, 453 F.3d 404, 410 (7th Cir. 2006). Specifically, the fiduciary may risk violating the terms of the plan by diversifying the EIAP in such a situation, but may violate his fiduciary duty of prudence if he fails to diversify and subjects the participants to unreasonable levels of risk. *Pugh v. Tribune Co.*, 521 F.3d 686, 701 (7th Cir. 2008). Some courts have resolved these conflicting obligations by granting the fiduciary a presumption "that a fiduciary's decision to remain invested in employer securities was reasonable." *Kuper v. Ivenko*, 66 F.3d 1447, 1459 (7th Cir. 1995); *see also Moench*, 62 F.3d at 571-72. In agreement with this line of cases, the Seventh Circuit has concluded that, in such a scenario, "the plaintiff must show that the ERISA fiduciary could not have reasonably believed that the plan's drafters would have intended under the circumstances that he continue to comply with the [plan's] direction that he invest exclusively in employer securities." *Pugh*, 521 F.3d at 701 (quoting *Summers*, 453 F.3d at 410).

Defendants in this case are not entitled to the presumption, however; the cases cited above that establish a deferential review for a fiduciary's decision all involve Employee Stock Ownership Plans ("ESOPs") that *require* that a substantial portion of the plans be invested in the stock of the employer. The Plan at issue here does not require the fiduciaries to offer the Motorola Stock Fund as an option; the Motorola Profit Sharing and Investment Plan provides only that "[t]he Trust Fund *may* be invested in Company Securities." (Defs.' Ex. 1 at 64 (emphasis added).) This undermines the rationale that supports the presumption, because the fiduciaries no longer face the dilemma of choosing between violating the plan agreement or violating their duty of prudence; in other words, the fiduciaries could choose not to offer the Motorola Stock Fund without violating the terms of the Plan. *See In re Schering-Plough Corp. ERISA Litig.*, 420 F.3d 231, 238 n.5 (3d Cir. 2005).

Even without the benefit of a presumption in their favor, however, Defendants have

demonstrated that continuing to offer the Stock Fund did not violate their fiduciary duty of prudence. Plaintiffs' claim that Defendants' decision to continue offering the Motorola Stock Fund despite the coming problems with the Telsim loan was an imprudent one necessarily requires a finding that removing the Stock Fund from the Plan, or at least halting further investments in the Fund, would have been more prudent. But "[c]ourts must recognize that if the fiduciary, in what it regards as an exercise of caution, does not maintain the investment in the employer's securities, it may face liability for that caution, particularly if the employer's securities thrive." *Edgar v. Avaya, Inc.*, 503 F.3d 340, 349 (3d Cir. 2007) (quoting *Moench*, 62 F.3d at 571-72). This general principle that ERISA fiduciaries are not required to jump in and out of employer securities is fully applicable here. Indeed, as Plaintiffs own expert conceded, it "would be a pretty dangerous thing to do" for "the fiduciaries of a plan that has a single stock investment fund [to] open and close the fund depending on the short-term performance of that stock." (Vander Vennett Dep. 126:16-21, Ex. 58 to Defs.' 56.1.) And, as discussed above, selling off Motorola stock based on non-public information known by Defendants risks running afoul of the insider trading laws. *See Harzewski v. Guidant Corp.*, 489 F.3d 799, 808 (7th Cir. 2007) ("It probably would have been unlawful, moreover, for Guidant to sell the Guidant stock held by the pension plan on the basis of inside knowledge of the company's problems.").

Admittedly, there may be circumstances where moving in and out of employer securities is prudent, such as when a company is facing "impending collapse," *Moench*, 62 F.3d at 572, or in other extraordinary circumstances. In *Steinman v. Hicks*, for instance, the court mused, hypothetically, that an ERISA fiduciary may have an obligation to sell, or at least diversify, the employer's holdings in an ESOP under such extreme circumstances as these: all or most of the plan participants were nearing retirement; the ESOP was the principal retirement asset; and the employer was acquired in a stock-for-stock deal by a company with a higher debt-to-equity ratio, thus introducing greater volatility into the retirement accounts of the participants who are nearing

retirement. 352 F.3d 1101, 1106 (7th Cir. 2003). No such drastic scenario existed here. Plaintiffs have produced no evidence that Motorola was on the verge of collapse, or that it had an elderly workforce with a substantial interest in less risky investments. Instead, Motorola continued to offer its own stock as one of nine investments in the employees' 401(k) accounts, and continued to warn the employees that it was the riskiest investment available. Regardless of what Defendants knew about business deals that the public did not, the mere option of investing in company stock was not imprudent.

Defendants are entitled to summary judgment on Count I both by virtue of the section 404(c) safe harbor and because Plaintiffs did not establish the existence of a genuine dispute as to the prudence of continuing to offer the Motorola Stock Fund as an investment option within the Plan.[10]

## III.    Failures to Appoint, Monitor, and Inform Committee Members

Plaintiffs are silent as to whether section 404(c) bars Count III of the Complaint, which alleges that the director Defendants breached their fiduciary duties based on inadequate supervision of the Committee. Given the decision in *Hecker*, however, the court concludes that section 404(c) bars all claims for a breach of fiduciary duty when the loss is caused by Plaintiffs' exercise of control. As discussed above, Plaintiffs' losses here were caused by their own exercise of independent control over the assets in their 401(k) accounts, and the section 404(c) safe harbor serves as a defense to Count III of the Complaint as well.

Even if this claim is not precluded by section 404(c), the court concludes that Plaintiffs have not presented a genuine issue of material fact that Defendants breached their fiduciary duties. The

---

[10]    The court also notes that the representative Plaintiffs appear to have disclaimed Count I. Each of the three named class representatives testified that he thought that Defendants should have continued to offer the Motorola Stock Fund throughout the investment period, although they should have provided more information about the looming financial difficulties caused by the Telsim transaction. (Defs.' 56.1 ¶ 100.) Whether an appointed class representative can waive a cause of action on behalf of the entire class based on his own statements is a difficult question, but the court is at least doubtful that the class can pursue a claim when the representative states that he "disagree[s] with Claim I," as Plaintiff White did. (*Id.*)

Complaint identifies three separate breaches: a failure to appoint Committee members with the necessary independence, knowledge, and experience to manage the Plan; a failure to properly monitor the Committee; and a failure to provide Committee members with sufficient information to enable them to do their duties. None of these allegations has traction.

Plaintiffs' failure to appoint appropriate Committee members claim essentially consists of two separate arguments: that the Committee members lacked independence, and that the Committee members were unqualified to manage Plan assets. This court previously addressed the allegation by Plaintiff Howell that several committee members were Motorola employees and therefore "by definition" lacked independence. *Howell*, 337 F. Supp. 2d at 1096. The court rejected that argument, noting that ERISA specifically permits employees to serve as plan fiduciaries, and Plaintiffs have presented no new evidence or argument that calls that conclusion into question. *Id.* (citing 29 U.S.C. § 1108(c)(3)).

Plaintiff's alternative argument—that the Director Defendants breached their fiduciary duties by appointing Committee members who lacked the necessary skill to manage Plan assets—was presented earlier, as well. In its previous ruling, the court was not required to, and in fact did not, make a definitive holding on the issue. The court did, however, express its "doubts that Plaintiff's allegations that Director Defendants breached their duty to appoint appropriate Committee members are sufficient even under Rule 8(a)'s liberal pleading standards." *Howell*, 337 F. Supp. 2d at 1097. Regardless of whether Lingis properly pleaded this claim in his Complaint, Plaintiffs produced no evidence to support a claim that the members of the Committee were unqualified for the job. During the class period, the Committee consisted of Koenemann (CFO of Motorola); Garth Milne (Motorola Treasurer); Gary Tooker (Motorola Board member and former Motorola CEO); Steve Earhart (Motorola Senior Vice President of Finance); Paul DeClerck (occupation not disclosed); and Rich Enstrom (occupation not disclosed). (Defs.' 56.1 ¶¶ 33-37.) Given the jobs held by the Motorola officials in the Committee (at least those whose jobs are known), there is no

reason to doubt that this Committee as a whole possessed financial sophistication. Even if Plaintiffs are correct that Committee members breached their fiduciary duties by acting imprudently, the *appointment* of such experienced individuals violated no fiduciary duties.

Plaintiffs next argue that the Director Defendants violated their fiduciary duty to monitor the Committee. As noted above, fiduciaries charged with appointing and removing Committee members may well possess a duty to monitor the Committee's actions. *See Baker v. Kingsley*, 387 F.3d 649, 663 (7th Cir. 2004). This court previously declined to dismiss the claim that the Director Defendants breached their duty to monitor because it was "a question that will require extensive discovery and factual development." *Howell*, 337 F. Supp. 2d at 1099. Upon reviewing the evidence the parties have developed and considering the authority the court previously relied upon, the court is satisfied that Defendants are entitled to summary judgment on this claim, as well.

The court based its decision in *Howell* primarily on Department of Labor regulations and Seventh Circuit precedent. *Id.* In particular, the Department of Labor stated:

> At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan.

29 C.F.R. § 2509.75-8 (FR-17). This duty to monitor has clear limits, though, as the statute itself states that "a person is a fiduciary with respect to a plan *to the extent* (i) he exercises any discretionary authority or discretionary control respecting management of such plan." 29 U.S.C. § 1002(21)(A) (emphasis added). As the DOL regulations make clear, members of the board of directors who select—and retain the authority to remove—Committee members fall within this statutory definition of fiduciary, although "their responsibility, and, consequently, their liability, is limited to the selection and retention of fiduciaries." 29 C.F.R. § 2509.75-8 (D-4); *cf. In re WorldCom, Inc.*, 263 F. Supp. 2d at 759-60 (rejecting argument that authority to appoint and remove by itself creates a duty to monitor appointee's performance). The duty to monitor is thus

a natural extension of the duty to appoint and remove plan fiduciaries. The Seventh Circuit implicitly recognized this when it first enunciated the duty to monitor in *Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984). The *Leigh* court noted that "the fiduciaries responsible for selecting and retaining their close business associates as plan administrators . . . had a duty to monitor appropriately the administrators' actions." *Id.* at 135. This formulation rests upon the premise that the scope of the duty to monitor is determined by the scope of the fiduciary's power to appoint and retain plan administrators. *See also Martin v. Feilen*, 965 F.2d 660, 669-70 (8th Cir. 1992) (duty to prevent wrongful conduct "[d]epend[s] upon the circumstances").

Plaintiffs argue that this duty to monitor entails monitoring whether the Motorola Stock Fund was a prudent investment. The court disagrees that the duty is so comprehensive. The Department of Labor regulation cited above stated that fiduciaries can comply with the duty to monitor by reviewing the fiduciaries' performance "at reasonable intervals." 29 C.F.R. § 2509.75-8 (FR-17). Beyond this review, as the Seventh Circuit has stated, one with the authority to appoint and remove fiduciaries is "not obligated to examine every action taken by [the fiduciary]." *Leigh*, 727 F.2d at 135. Members of the Profit Sharing Committee of Motorola were elected to one-year terms during the class period, a process that allowed for an annual review of the Committee members' performances. (Defs.' 56.1 ¶¶ 33-34.) Although Plaintiffs have cited the testimony of a number of Motorola directors that they did not perform any direct monitoring of the Plan, Plaintiffs have not directly challenged the contention that one-year terms provides for a systematic monitoring mechanism on at least an annual basis. In addition, the Board arranged for its external auditor, KPMG, to review the performance of the Plan and report on anything out of the ordinary. (*Id.* ¶ 42.)

The court can imagine situations where this level of monitoring—appointing new members

once per year and external auditing[11]—may be insufficient to satisfy a director's duty to monitor plan administrators; in *Leigh*, for instance, where the plan administrators were also employed by the appointing fiduciaries, the appointing fiduciaries may have a greater duty to monitor the performance of the administrators. *Leigh*, 727 F.2d at 135-36. Here, however, members of the Board who were tasked with appointing—and, if necessary, removing—members of the Committee were not required to monitor the prudence of the individual investments offered under the Plan. Such a broad duty to monitor would undermine the entire rationale of creating a specialized committee tasked with determining what investments should be offered under the Plan. Plaintiffs effectively suggest that the entire board of one of the world's largest telecommunications company was required not only to monitor the competence and overall performance of its 401(k) committee, but also to monitor the committee's individual decisions. Plaintiffs' proposed rule would defeat the efficiency gains corporate boards routinely achieve by delegating primary responsibility for particular functions to specialized committees. *See generally* ABA, *Corporate Director's Guidebook, Third Edition*, 56 Bus. Law. 1571, 1596-99 (2001). ERISA does not require such a result. 29 U.S.C. § 1002(21)(A) (persons are only fiduciaries "to the extent" that they exercise control over the plan).

Finally, Plaintiffs also allege in the Complaint that Galvin and Growney failed to give the Profit Sharing Committee adequate information to enable it to perform its duties. Plaintiffs have not supported this argument in either their response to Defendants' motions for summary judgment or in their own motion for summary judgment. The court will not construct its own argument to support this allegation, and considers this argument waived. *See Argyropoulos*, 539 F.3d at 739. The court nevertheless notes its own skepticism that Galvin and Growney, who are ERISA fiduciaries based

---

[11]     Tooker also testified that the Board received reports from the Committee, including annual reports, regarding the performance of the Plan. (Defs.' 56.1 ¶ 42.) The parties dispute how detailed these reports were (Pls.' Resp. ¶ 42), but since neither party has actually produced the reports themselves, the court is unable to assess this issue. *See* FED. R. EVID. 1002.

solely on their power to appoint and remove members of the Committee, could owe Plan beneficiaries a duty to inform the Committee of facts when the Committee itself does not, as discussed *supra*, have a duty to inform the beneficiaries of those facts. Therefore, even without section 404(c)'s safe harbor, Defendants are entitled to summary judgment on Count III.

## IV. Other Questionable Transactions

The preceding analysis has concerned Motorola's interactions with Telsim and the actions of Motorola officials as ERISA fiduciaries. Plaintiffs' briefs also contain sporadic references to other either illegal or misguided transactions made by Motorola and two other companies. One of those companies, Iridium LLC, was a wholly owned subsidiary with whom Motorola allegedly entered into misguided transactions after Iridium was spun off as a separate entity; Iridium declared bankruptcy in 1999. (Pls.' 56.1 ¶¶ 349-51, 359, 367-68.) The other company, Adelphia, Inc., was involved in an SEC investigation that resulted in Motorola's paying a $25 million fine for allegedly inflating Adelphia's earnings. (Defs.' 56.1 ¶ 93.)

The court declines to consider any of these transactions in the ensuing analysis for two reasons. First, Plaintiffs did not make a single mention of either the companies or the disputed transactions in the Complaint, and cannot make the argument for the first time at this stage. *See Insolia v. Philip Morris Inc.*, 216 F.3d 596, 606 (7th Cir. 2000) ("A plaintiff may not amend his complaint through arguments in his brief . . . .") (quoting *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)). Second, Plaintiffs offered no evidence that these transactions negatively affected Motorola share prices during the class period: Iridium declared bankruptcy in 1999 and the SEC investigation regarding Adelphia was not disclosed until 2006. (Defs.' 56.1 ¶ 92.) Thus, nothing in Plaintiffs' recent allegations concerning these other questionable business decisions of Motorola undermines the conclusion that Defendants are entitled to summary judgment on the claims made by Plaintiffs in the Complaint.

## CONCLUSION

For the reasons given above, Plaintiffs' Motion for Summary Judgment [329] is denied. The court grants the Motions for Summary Judgment of Defendants Motorola, Inc. [313]; Rick Dorazil [314]; Gary Tooker [320]; Christopher Galvin [316]; Robert Growney [317]; Carl F. Koenemann [318]; The Profit Sharing Committee of Motorola, Inc. [319]; and H. Laurence Fuller, Anne P. Jones, Judy C. Lewent, Walter E. Massey, Nicholas Negroponte, John E. Pepper, Jr., Samuel C. Scott, and John A. White [315].

ENTER:

Dated:  June 17, 2009

_____
                                        REBECCA R. PALLMEYER
                                        United States District Judge